IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| KENNETH H. MILLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. _____ |
| ) | |
| RETIREMENT PROGRAM PLAN FOR ) | |
| EMPLOYEES OF CONSOLIDATED ) | |
| NUCLEAR SECURITY, LLC AT THE ) | |
| U.S. DEPARTMENT OF ENERGY ) | |
| FACILITIES AT OAK RIDGE, ) | |
| TENNESSEE, ) | |
| Defendant. | |

## ERISA COMPLAINT

Plaintiff Kenneth H. Miller brings this complaint against Defendant Retirement Program Plan for Employees of Consolidated Nuclear Security, LLC at the U.S. Department of Energy Facilities at Oak Ridge, Tennessee to recover wrongfully denied pension benefits, and would allege as follows:

### PARTIES

1. Plaintiff Miller is an "employee" of Consolidated Nuclear Security, LLC, 29 U.S.C. § 1002(6), and a "participant" of the Plan, 29 U.S.C. § 1002(7). He is a citizen of the State of Tennessee and resides in Cumberland County, Tennessee.

2. Defendant Retirement Program Plan for Employees of Consolidated Nuclear Security, LLC at the U.S. Department of Energy Facilities at Oak Ridge, Tennessee ("Plan") is an employer-sponsored "defined benefit" "employee pension benefit plan." 29 U.S.C. §§

1

1002(2)(A), 1002(35). The Plan is a legal entity that can sue and be sued. 29 U.S.C. § 1132(d)(1). It can be served via its agent for service of legal process, the Plan administrator.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as mandated by 29 U.S.C. § 1132(e)(1).

4. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2) because the Defendant Plan can be found in this district and the Plan is administered in this district.

## FACTUAL ALLEGATIONS

### PLAINTIFF'S EMPLOYMENT HISTORY

5. Miller took a job as an electrical inspector at the Y-12 Facility in Oak Ridge, Tennessee on September 14, 1992. He has held that same job continuously since that time, except for a two-month period in 1998, and he continues in that same job today.

6. Y-12 is a U.S. Department of Energy ("DOE") nuclear manufacturing facility. DOE contracts with private entities, called prime contractors, to manage and operate the facility.

7. The prime contractor running Y-12 has changed several times during Miller's tenure. However, Miller's job duties as an inspector have remained constant since 1992 regardless of the DOE contractor over the facility at any given time.

8. In 1992, when Miller began working at Y-12, the prime contractor was Lockheed Martin. Lockheed Martin sponsored the Plan for eligible Y-12 employees.

9. However, Miller was hired on at Y-12 through a company called Midwest Tech. Midwest Tech later changed its name to CDI Corporation. Midwest Tech and CDI Corporation were subcontractors to Lockheed Martin.

2

10. During this time, Miller was one of 5 inspectors employed by Midwest Tech and later CDI Corporation. However, Miller believed he was misclassified as an employee of a subcontractor, rather than an employee of Lockheed Martin.

11. Every day, since November 1992, Miller has arrived at the Y-12 facility and commenced building inspections. Depending on the size of the building, he might spend several days inspecting the same building, or he might conduct multiple building inspections in one day.

12. Nearly all of the people with whom Miller dealt on a daily basis, other than these inspectors, were and continue to be direct hires of the prime contractor: his supervisor, the people working in the office, and the people working in the buildings he inspected.

13. In 2000, a company called BWXT won the DOE contract for the Y-12 Facility and replaced Lockheed Martin as the prime contractor. BWXT adopted the Plan, which continued to provide pension benefits to eligible Y-12 employees.

14. In late 2004, BWXT apparently realized that Miller had been misclassified by Lockheed Martin as an employee of a subcontractor, and so BWXT converted Miller and the other inspectors to direct hires of the prime contractor in the company's records.

15. On or about January 18, 2005, BWXT sent Miller a letter confirming that his service credit date for Plan purposes had been adjusted back to his original hire date in 1992:

> Effective January 3, 2005, your Credited Service Date was adjusted from December 6, 2004, to November 21, 1992, for purposes of vesting and eligibility for participation in the Retirement Program Plan for Employees of BWXT. Credited Service *does not affect any benefits at BWXT Y-12 Complex other than pension and savings plan. Vacation and service eligibility is based Company Service.

*See* Ltr from Cottrell to Miller, January 18, 2005, attached hereto as Exhibit A.

3

16. Nothing about Miller's job changed after his adjustment to direct hire status, except the name on his pay checks and the employee benefits offered him.

17. Both before and after the adjustment of status, Miller's supervisor was David Peebles, who was always a direct employee of the prime contractor. Miller took all instructions from Peebles both before and after his adjustment to direct hire status. Peebles had authority to terminate Miller's employment both before and after his adjustment to direct hire status.

18. In 2013, Consolidated Nuclear Security, LLC ("CNS") won the DOE contract for the Y-12 facility, and CNS replaced BWXT as prime contractor in the summer of 2014.

## PLAINTIFF'S CLAIMS HISTORY

19. Miller began thinking about retirement in 2016. Like the 2005 letter from BWXT, the pension information available to Miller online showed his "credited service" date as November 21, 1992.



*See* Print-Off of Pension Projection System, April 5, 2016, attached hereto as Exhibit B.

20. However, despite recognizing his credited service back to 1992, Defendant calculates Miller's estimated pension benefit based on a 2004 hire date. For example, a March 2016 pension report shows his pension benefit calculated using the "pension service" date of December 6, 2004. *See* Pension Report, March 3, 2016, attached hereto as Exhibit C.

21. By letter dated June 28, 2016, Miller requested all Plan documents from the Plan administrator. Subsequently, Miller received a partial production of Plan documents consisting of a copy of the Plan document and a summary plan description ("SPD"), both of which were incomplete copies missing entire sections and/or pages.

4

22. Miller, through counsel, made follow-up requests for the complete documents but did not receive a complete production of relevant Plan documents.

23. Miller submitted a claim for benefits as per the Plan's claims procedures on or about October 10, 2016, seeking a pension benefit calculated using his 1992 hire date.

24. By letter dated November 15, 2016, the Plan, through counsel, denied the claim. In particular, the letter stated that the Credited Service date is used solely for the purpose of determining eligibility for Plan participation, and that "[g]enerally, the CNS Plan provides that Company Service Credit is used to determine a participant's accrued benefit." The letter did not contain references to Plan definitions or provisions, but instead spoke in generalities.

25. On or about January 13, 2017, Miller appealed the denial of benefits in accordance with the Plan's claims procedures. In particular, Miller pointed to specific Plan provisions defining and utilizing the terms Credited Service and Company Service in a manner inconsistent with the Plan's previous adverse determination letter.

26. By letter dated February 9, 2017, the Plan, through counsel, denied the appeal and, for the first time, provided Miller with the Plan documents he had requested 8 months prior. The letter again failed to make reference to any Plan terms, but simply stated that Miller was an employee of CDI Corporation prior to 2004 and not eligible to accrue benefit under the Plan.

27. On or about May 22, 2017, Miller, now having the benefit of seeing the relevant Plan documents, submitted a second appeal letter referencing the Plan terms in those documents. This appeal was supported by two sworn employee declarations and the 2005 Cottrell letter.

28. By letter dated July 7, 2017, the Plan, through counsel, denied the appeal. Again, the letter did not cite to Plan terms, but instead referred to documents in Miller's personnel file evidencing his employment with CDI Corporation, rather than the prime contractor.

5

Case 3:17-cv-00521   Document 1   Filed 12/01/17   Page 5 of 9   PageID #: 5

29. None of Defendant's three adverse determination letters made reference to or drew support from the terms of the Plan itself.

30. All of Defendant's adverse determination letters were signed by Plan counsel.

31. Miller has exhausted the Plan's internal claims procedure.

32. By letter dated July 11, 2017, Miller sent the Plan administrator a written request for a complete copy of the administrative record of his claim and appeals. In response, the Plan provided 12 pages of Miller's personnel file, a benefits estimate for Miller, and some recent amendments to the Plan document.

## CAUSE OF ACTION

### Wrongful Denial of Benefits
### 29 U.S.C. § 1132(a)(1)(B)

33. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

34. CNS adopted the Plan and became the participating employer and "plan sponsor" of the Plan as that term is defined by Section 3(16) of ERISA, 29 U.S.C. § 1002(16), in 2014.

35. The Plan designates the Benefits and Investment Committee of CNS or its delegate as Plan "administrator." 29 U.S.C. § 1002(16). The Plan gives the administrator the discretion to decide benefit claims and otherwise administer the Plan, except that the discretionary authority to determine appeals of claims determinations lies solely with the Benefits Appeals Committee. *See* Section 15.4 of the Plan.

36. Upon information and belief, the Plan is governed by a 2008 Plan document, as amended, and the 2011 Summary Plan Description ("SPD"), called a Book of Benefits.

37. The Plan provides retirement benefits to eligible employees of the "Company," which is defined as the prime contractor at the time and its successors.

38. Despite being initially misclassified by Lockheed Martin, which misclassification was corrected in 2004, Miller has been an employee of the prime contractor since 1992. As such, he is entitled to a retirement benefit based on his original hire date of 1992.

39. All documents provided by CNS and its predecessors to Miller list November 21, 1992 as Miller's "Credited Service" date. *See* Exhibits A and B.

40. The Plan document unambiguously states that normal retirement benefits are calculated by multiplying a percentage of the participant's average monthly compensation by "the number of Years (and months) of the Participant's Credited Service."

> (a) Regular Formula A: 1.2 percent of "Average Monthly Compensation," where Average Monthly Compensation is the greater of (i) or (ii), where:
>
> > (i) is 1/36th of Compensation for the three full calendar years in which Compensation was largest during the 10 full calendar years next preceding the date of retirement; and
>
> > (ii) is 1/36th of Compensation for the 36 full calendar months next preceding the date of retirement; provided that for purposes of this calculation the Compensation (as defined in Section 1.15) received in any calendar month within the third preceding calendar year shall be the total Compensation received in such year divided by the number of months worked in such year;
>
> multiplied by the number of Years (and months) of the Participant's Credited Service, plus $18; or

*See* Section 5.1(a).

41. Defendant's insistence that Miller's retirement benefit is calculated based on his "Company Service" date or "Pension Service" date is patently inconsistent with the Plan terms.

42. In fact, the terms "Company Service" and "Pension Service" do not even appear in Section 5.1 of the Plan, "Computation of Normal Retirement Benefit, Unreduced Early Retirement Benefit and Deferred Retirement Benefit."

7

43. Further, Defendant's distinction between "Credited Service" and "Company Service," which is the basis for its adverse benefit determinations, is also not supported by the text of the Plan document, which uses a circular definition of these terms:

   a. "'Company Service Credit' is the service that is used to determine the amount of a Participant's Accrued Benefit for benefit accrual purposes." Section 1.14.

   b. "'Credited Service' is service that is used for purposes of eligibility and vesting and shall mean, for any Employee, such Employee's Company Service Credit." Section 1.17.

44. The Plan document does not contain a definition of "pension service."

45. The terms of the Plan clearly entitle Miller to a pension benefit calculated using his Credited Service date of November 21, 1992. The Plan's three adverse benefit determinations are contrary to the unambiguous terms of the Plan.

46. The Plan's decision to the contrary is not entitled to deference because the Plan terms do not give the administrator or its delegate discretion in deciding participant appeals.

47. Even if the Plan's decisions are entitled to a deferential standard of review, the adverse decisions are an abuse of discretion. In fact, the administrative record does not evidence any deliberation as to the meaning of Plan terms or other exercise of discretion by the Plan administrator or any other Plan decision-maker as to Miller's claim and appeals.

**WHEREFORE**, Plaintiff requests the following relief:

1. An injunction requiring Defendant to recognize Plaintiff's entitlement to pension benefits calculated using November 21, 1992;

2. An award of the costs and expenses of litigation, including but not limited to attorneys' fees; and

3. An award of any further equitable or legal remedy that the Court deems appropriate.

DATED: December 1, 2017

Respectfully submitted,

/s/ Karla M. Campbell
Karla M. Campbell (BPR # 27132)
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Ave., Suite 200
Nashville, Tennessee 37203
Tel.: (615) 254-8801
Email: karlac@bsjfirm.com

*Attorney for Plaintiff Kenneth Miller*